MIDDLESEX RAILROAD COMPANY *vs.* THOMAS L. WAKEFIELD
& others.

The right of the Commonwealth to widen the draw in a bridge belonging to it over a navigable stream is not impaired by the fact that the widening will temporarily interrupt the use of the street railway of a corporation to which it has granted a right to run cars over the bridge.

BILL IN EQUITY against Thomas L. Wakefield, Edward S. Philbrick and William T. Davis, the commissioners authorized by the St. of 1869, *c.* 272, to widen the draws in Charles River Bridge and Warren Bridge, and against William A. Kenrick, to restrain them from widening said draws in such a manner as to prevent the plaintiffs from running their cars as usual over those bridges at all times. The case, as it appeared from the bill, answer and agreed facts, on which it was reserved by *Ames*, J., for the determination of the full court, was as follows:

The bridges are situated near each other, and both lead from Boston to Charlestown and are the property of the Commonwealth. The plaintiffs were incorporated by the St. of 1854, *c.* 434, for the purpose of constructing, maintaining and using a horse railway or railways leading from Boston to Charlestown over both bridges. By the second section of this statute it was provided that the tracks of the plaintiffs' railway upon the bridges should be located by three commissioners to be appointed by the governor, and that these commissioners should fix and determine ' the construction of suitable draws in said bridges, and the manner in which the same shall be managed and opened for the passage of vessels, and the attendance upon the same; and in case tolls shall be demanded for the passage of persons or vehicles over said bridges, the said commissioners shall have power to fix and determine the amount which shall be paid by said corporation for such use of such bridges respectively; and in case the same shall be assented to by the corporation, the same shall be binding upon the Commonwealth and said corporation, so long as said bridges respectively remain the property of the Commonwealth, unless the same shall be released, or some part thereof, by the legislature; and in case said corporation shall not assent

to the rate of compensation as found by said commissioners, the supreme judicial court, upon petition of said commissioners or of said corporation, and upon notice to the other party, shall appoint three commissioners, who shall, upon due notice to the parties interested, proceed to determine and fix the rate of compensation or toll." The fourteenth section provided that the legislature might at any time "repeal this act, or limit, restrict or annul any powers herein granted."

The plaintiffs proceeded to construct their road ; the commissioners appointed under the second section of the act located the track of the plaintiffs' railway on the centre of the bridges; and the plaintiffs accepted the doings of the commissioners, agreed with them upon the toll to be paid, and paid such toll so long as tolls were collected on the bridges. In March 1857 the plaintiffs began to run their cars over the bridges, on their road thus located and constructed, and have continued to do so ever since. The daily number of passages by their cars in the year beginning March 1857, during which toll was paid to the Commonwealth, was three hundred, and the daily number of passages at the time of filing this bill was eight hundred and twenty. The plaintiffs always kept the part of the bridges between their tracks in repair.

By the St. of 1869, *c.* 272, the defendants Wakefield, Philbrick and Davis, were authorized as commissioners to "cause to be made, in lieu of the existing draws in Charles River and Warren Bridges, a draw in each bridge with a clear opening of forty-four feet in width," and made a contract with the defendant Kenrick to make a new draw in Charles River Bridge. The plaintiffs knew of this contract, and were notified that the bridge would be taken up in some ten days. The interruption to travel over the bridge would continue for six weeks or two months. The damage to the plaintiffs was estimated by their president at $400 a day so long as the interruption continued, unless, as they had authority to do, they laid a second track over Warren Bridge, on which the defendants did not intend to commence work until they had completed the draw on Charles River Bridge.

*L. Child & L. M. Child*, for the plaintiffs.

*T. L. Wakefield*, for the defendants.

AMES, J.   The franchise conferred by charter, upon corpora‑ tions of the class to which these plaintiffs belong, is of a care‑ fully limited and qualified nature.   They are authorized to use the streets in which their tracks may be laid, in a manner in some respects differing from the ordinary public use, and to some extent modifying the rights of other travellers over those streets. But the use of the streets is granted to them only in common with others.   Their franchise does not give them the control of the highways.   By the general legislation on the subject, as well as by the terms of the charters, that control is placed, or, more properly speaking, remains, in the municipal authorities of the places in which any part of the street railway is laid.   Those municipal officers have the power to control and regulate in a great degree the manner in which the franchise of the railway corporation is to be exercised; and it is made their duty, by means of that control, to protect the rights and promote the con‑ venience of the whole public.   It will not be contended that anything contained in the plaintiffs' charter could in any event be construed as conflicting with the right and duty of any town or city through which their railway may pass to make all such needful repairs or improvements of highways, such widening of culverts or enlargement of bridges, as may from time to time become necessary, even though a serious interruption to the use of the railway might be thereby rendered unavoidable.   On such occasions the owners of street railways, like all other par‑ ties desirous of using the highway, must submit to a temporary inconvenience for the sake of a permanent advantage.

But the plaintiffs claim that, as to so much of their railway as has been " located" on either of the bridges between Boston and Charlestown, this rule does not apply.   They contend that, by the terms of their charter, the Commonwealth has parted ab‑ solutely and forever with all right and power to interrupt or inter‑ fere with the use of the tracks " located on those bridges," even for the purpose of repairing. improving or rebuilding them, or of widening the draws, whatever new public exigency may arise

It is difficult to believe that such could have been the intention of the legislature; and we do not think the statute will bear any such construction. The second section provides that the tracks upon those bridges shall be " located " by three commissioners, to be appointed by the governor; that they shall fix and determine " the construction of suitable draws in said bridges, and the manner in which the same shall be managed and opened for the passage of vessels, and the attendance upon the same; and in case tolls shall be demanded for the passage of persons or vehicles over said bridges, the said commissioners shall have power to fix and determine the amount which shall be paid by said corporation for such use of such bridges respectively; and in case the same shall be assented to by the corporation, the same shall be binding upon the Commonwealth and said corporation, so long as said bridges respectively remain the property of the Commonwealth, unless the same shall be released, or some part thereof, by the legislature; and in case said corporation shall not assent to the rate of compensation as found by said commissioners, the supreme judicial court, upon petition of said commissioners or of said corporation, and upon notice to the other party, shall appoint three commissioners, who shall, upon due notice to the parties interested, proceed to determine and fix the rate of compensation or toll." It is the amount of compensation or toll, to be paid by the corporation for the use of the bridges respectively, which, if assented to, shall be binding upon the Commonwealth, so long as the bridges remain its property, and which, in case of disagreement, is to be determined finally upon appeal to the supreme judicial court. It is not claimed or intimated that the corporation was to pay anything whatever for the privilege of laying its tracks over them. The terms of the act indeed show very plainly that it was understood to be entirely uncertain whether the corporation would be required to pay to the Commonwealth any sum of money whatever. It is only in the event of the reimposition of tolls that the corporation would be required to pay for the use of the bridges, and then only for the passage of their vehicles across them, in the same manner and upon the same principles as in

the case of any and all other persons crossing them with vehicles. The provision that " the same shall be binding upon the Com· monwealth " " unless the same shall be released, or some part thereof, by the legislature," would be a proper form of expression in relation to the tolls or amount of compensation to be paid, but hardly seems appropriate or applicable to the subject matter of " the construction of suitable draws in the bridges, and the manner in which the same shall be managed and opened for the passage of vessels, and the attendance upon the same." If the plaintiffs' interpretation of their charter were more plausible than we consider it, it is by no means certain that the statute under which these defendants are acting might not be sustained under the right reserved to the legislature in the fourteenth section of the plaintiffs' charter " to limit, restrict or annul " any of the powers granted by that charter.

But we do not find it necessary, in order to justify the defendants, to resort to the power of the legislature to limit, restrict or annul its own grant. The bridges are the property of the Commonwealth, and they cross a navigable stream which is itself of common right a public highway for the passage of vessels. The sovereign power of the state, that is to say the legislature alone, has the power and is charged with the trust of deciding whether the public good may be better served by causing bridges to be thrown over it than by suffering the natural passage upon its channel to remain free. The legislature is the only tribunal that is to reconcile these conflicting interests. *Commonwealth v. Essex Co.* 13 Gray, 239. It is under precisely the same obligation to make suitable provision to preserve the navigation of the river, having in view the magnitude and comparative importance of that interest, as it is to provide for the accommodation of public travel by means of bridges. The bridges must necessarily be a great obstruction to navigation, and it is for the legislature, acting as the best good of the public on the whole may require, to prescribe as a condition to projectors who may be authorized to build them, or it may lay down for itself, with regard to bridges belonging to the Commonwealth, such a mode of construction as will sufficiently preserve for vessels the nat-

ural passage by the stream, at the same time that the public may be accommodated by an artificial passage across it. We find nothing, in the whole course of legislation on the subject, which implies that the draws once established were intended to be unchangeably and forever fixed, so as never to be subject to any such reasonable modification, as to dimensions and shape and mode of use, as the increased demands of commerce or any new public exigency may require. We must look upon the statute, under which the defendants were proceeding to enlarge the draw, as a formal declaration of the legislature, acting in behalf of the public, that the existing provision for the passage of vessels was insufficient, and that the public convenience requires the proposed enlargement. No sound distinction, in our opinion, can be made between needful repairs and such improvements as are required by the public good. In our judgment, the right of way granted to the plaintiffs upon these bridges is the same as it is everywhere else, a right to use the highway in common with others. The privilege granted to them, of adapting a portion of each bridge to their peculiar mode of conveying passengers, was not intended to give them the control of the way; and upon the bridges, as well as elsewhere, and by these plaintiffs as well as by all others, the right of passage is to be enjoyed in subordination to the general right of the appropriate public authorities to make from time to time all such needful repairs, alterations and improvements as the public good may require.

On these grounds, we cannot view the St. of 1869, *c.* 272, as an encroachment upon the plaintiffs' charter, or a withdrawal of any portion of their grant, and therefore their

*Bill must be dismissed.*