CHACE TRUCKING COMPANY, Appellant, v. RICHMOND
LIGHT AND RAILROAD COMPANY, Respondent.

Street railways — negligence — horses attached to truck, transporting pile driver through street, killed by electricity passing from trolley wires through truck — whether railroad company was negligent in failing to raise wires to prevent accident question for the jury — contributory negligence of persons driving truck question for the jury.

1. The moving of a pile driver sixteen feet high, loaded upon a truck and drawn by fourteen horses through a street occupied by the tracks and trolley wires of a street railroad, is not necessarily an unreasonable use of the street.

2. Where the railroad company, having been notified by the truckmen moving the pile driver that they intended to take it through the street, sent a wrecking wagon and a gang of men to lift the wires and prevent injury to its wires or to the men and horses engaged in moving the pile driver, the railroad was not a mere volunteer, but was performing its legal duty.

3. In an action brought by the owner of the truck and horses against the railroad company for the value of horses killed by electricity passing through the truck, it appears that plaintiff's employees in charge of the truck hesitated for fear of collision with the trolley wires. The foreman of the defendant urged plaintiff's employees to go on and assured them that the wires would be raised if necessary, saying: "We are here and we will protect you, what more do you want." Relying upon such assurances, plaintiff's employees proceeded, and the truck came into contact with the trolley wire whereby electricity from it passed through the truck and killed some of the horses attached thereto. Held, that the order of the Appellate Division reversing the judgment for plaintiff and dismissing the complaint is erroneous; that it was a question for the jury whether the defendant's servants were not negligent in stating that they could and would lift the wire if the danger became imminent and in inviting plaintiff's servants to drive on, when, as defendant's servants now say, that was an impossible thing for them to do. The question of plaintiff's contributory negligence was, also, for the jury.

*Chace Trucking Co. v. Richmond Light & R. R. Co.*, 173 App. Div. 663, reversed.

(Argued December 9, 1918; decided January 28, 1919.)

APPEAL from a judgment, entered July 14, 1916, upon an order of the Appellate Division of the Supreme Court in the first judicial department, reversing a judgment in favor of plaintiff entered upon a verdict and directing a dismissal of the complaint.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Henry Waldman* and *Joseph G. Abramson* for appellant. The testimony adduced in behalf of plaintiff made out a *prima facie* case, and the questions of the negligence of defendant and the freedom from contributory negligence of plaintiff were properly submitted to the jury. (*American R. T. Co.* v. *Hess*, 125 N. Y. 641; *Hinman* v. *Clarke*, 121 App. Div. 105; *Western N. Y. & P. Traction Co.* v. *Stillman*, 68 Misc. Rep. 546; 143 App. Div. 717.) Appellant was not guilty of contributory negligence. (*Murray* v. *Dwight*, 15 App. Div. 241; *Brown* v. *Stevens*, 136 Mich. 311; *Berkhart* v. *Schott*, 101 Mo. App. 465; *Kettle* v. *Turl*, 162 N. Y. 255; *Cohen* v. *Met. St. Ry. Co.*, 63 App. Div. 165; 170 N. Y. 588.)

*Bertram G. Eadie* and *Frank H. Innes* for respondent. The appellant failed to prove the breach of any duty owed to it by the respondent either in contract, or in tort. (*Dickeson* v. *Kewanee*, 53 Ill. App. 379; *W. N. Y. & P. Traction Co.* v. *Stillman*, 143 App. Div. 717; *B. E. L. & P. Co.* v. *Lefevre*, 49 L. R. A. 771; *Gross* v. *S. C. C. Ry. Co.*, 73 Ill. App. 217; *Fort Madison St. Ry. Co.* v. *Hughes*, 14 L. R. A. [N. S.] 448; Curtis on Electricity [1915 ed.], §§ 366–376; *Northwestern T. Exch. Co.* v. *Anderson*, 12 N. D. 585; *N. Y. & N. J. Tel. Co.* v. *Diezheimer*, 11 N. J. L. J. 246; Elliott on Roads & Streets, § 1072; *Piehl* v. *Albany Ry. Co.*, 19 App. Div. 471.) The appellant was guilty of contributory negligence. (Shearman & Redfield on Neg. § 376.)

ANDREWS, J.  Bay street, Stapleton, is a street thirty-five to forty-five feet wide running north and south and is paved with asphalt.  Through it the defendant has a double-track electric road.  Power is conveyed to the cars through two overhead trolley wires, which although loaded with a dangerous current are necessarily exposed, which are fifteen feet from the pavement and each of which is twenty or twenty-two feet from the nearest curb.

On February 23, 1909, the plaintiff was moving by truck a heavy pile driver the top of which reached sixteen feet or more from the pavement.  Drawing this truck were fourteen horses.  Two of them were hitched side by side to the pole, while the twelve others, two by two, were attached to the pole by a cable.  Tied to the rear of the truck was another team hitched to a wagon the wheels of which were locked.  Obviously the truck was steered by the action of the two horses hitched to the pole.  The twelve in addition would have little effect upon it, unless the cable was taut and they were pulling upon it.

The truck reached Bay street from the east.  It was to turn toward the south.  It was, therefore, necessary for it to reach the west side of the street, and to do so it had to pass beneath the trolley wires.

The defendant, with its wires and other structures, was rightfully in the street.  But it was not there to the exclusion of those other public uses to which the street is adapted.  The grant to it was under the implied condition that it would not unreasonably interfere with such uses.  (*Lambert* v. *Westchester Elec. R. R. Co.*, 191 N. Y. 248; *Opdycke* v. *P. S. R. Co.*, 78 N. J. L. 576; *McKim* v. *Philadelphia*, 217 Penn. St. 243.)  It might be required temporarily to remove its tracks if the street was to be graded (*Matter of Deering*, 93 N. Y. 361); or if a sewer were to be built (*Brooklyn Elec. R. R. Co.* v. *City of Brooklyn*, 2 App. Div. 98; *New Orleans Gas L. Co.*

v. *Drainage Comn.*, 197 U. S. 453); or other public purposes served (*Chicago, B. & Q. Ry. Co.* v. *Drainage Comrs.*, 200 U. S. 561; *R. R.* v. *Middlesex Wakefield*, 103 Mass. 261). Nor might it interfere with the reasonable use of the highway by travelers upon it, even if such use involved temporary obstruction of its traffic or interference with its wires. Under some conditions such a use might include the removal of a building. (*Western N. Y. & P. Traction Co.* v. *Stillman*, 143 App. Div. 717.) Under others it might not. (*Williams* v. *Citizens' Ry. Co.*, 130 Ind. 71.) But in any event such use must be reasonable and the traveler might not unduly interrupt the operations of the road or negligently injure its structures. Reasonable use with concurrent rights is the rule.

We cannot say that the removal of this pile driver was an unreasonable use of Bay street. When they reached that street, therefore, what was the duty of the plaintiff's servants? They might not heedlessly destroy the defendant's wires. If without danger they might raise them and so pass beneath they might do so. But these wires were exposed and to the unskilled dangerous. If contact were made injury might happen, not only to plaintiff's servants but to defendant's property. If so, doubtless it would be claimed that the plaintiff was negligent. Yet it had the right to pass. Under these circumstances the defendant was notified of the situation. Equally recognizing the respective rights of the parties, the defendant at once sent a wrecking wagon and a gang of men so that the plaintiff might do in safety what it had a right to do. In this the defendant was not a mere volunteer. It was performing what in our judgment was its legal duty. This gang lifted the wires, signalled when they were ready and the truck was thus enabled to cross to the west side of Bay street and turn to the south. The wrecking wagon followed it closely to protect the defendant's wires should the need again arise.

If the pile driver came in contact with the exposed wires, every one recognized that there was danger, but just so long as the truck was on the level or was going up hill the cable attached to the horses would be taut and there would be no difficulty in steering it safely along the street near the curb.

This was at first the situation. There was a slight ascent, but when the top of the hill was reached a more difficult problem was presented. Ahead was a descent. The road was not straight but on a curve. A tree stood at the side with branches reaching over the street. The pavement was smooth. It had been raining and it was, therefore, probably wet and, to some extent, slippery. The load was of great weight. It could only be held back and steered by the action of the horses attached to the pole. For this purpose the other twelve horses were practically useless. The truck had no brake. The wagon behind would act as a brake to some extent, and would serve to steady the truck in its descent; just how much it is difficult to say without experiment. Any one who has attempted to drive a heavy wagon down a hill with a pair of horses holding back against a load knows how the wagon inevitably moves from side to side. To keep a straight course is most difficult. With reason, therefore, the servants of the plaintiff hesitated.

However, they were rightfully in the street. This the defendant had recognized. With its wagon the defendant's servants were on the spot to prevent a collision. Once already they had done so. Just how efficient they would or could be we may assume the driver of the truck and his companions did not know. But in any event, again the defendant was not a mere volunteer. It was so managing its property as to reconcile its rights with those of the plaintiff.

Knowing whether or not the situation was safe, seeing the plaintiff's hesitation the defendant urged it on. The

plaintiff's foreman, to some extent, at least, had explained his difficulty to the defendant's foreman. He said that the truck would be likely to turn into the wires; that one end or the other would strike them. In reply the defendant's foreman assured him that he and his companions were there and that they would raise the wires if it was necessary. He said " we are here and we will protect you, what more do you want."

It is familiar knowledge that an inference or invitation of assurance may be drawn from the raised gate at a railway crossing — an inference drawn equally whether the gate is required to be maintained or is maintained voluntarily. In principle the express assurance here given is not unlike that there drawn from circumstances. Relying upon it as they had relied on the earlier assurance when they drove under the wires the plaintiff's servants started down the hill. The result, which was reasonably to be expected, happened. The front end of the truck ran toward the middle of the street and came into collision with the trolley wire which was not lifted by the defendant's servants as they had promised. Electricity passed through the truck, and some of the horses attached to it were killed. Under these circumstances we think there is a fair question of fact for the jury as to whether the defendant's servants were not negligent in stating that they could and would lift the wire if danger became imminent, and in inviting the plaintiff to drive on, when as they now say that was an impossible thing for them to do. Whether there was danger or not was a matter in respect to which they assumed to have superior knowledge. Further in giving the assurance that they did, it follows that at least the jury might find that they were acting within the scope of their authority. They were engaged in their master's business. They were acting not for themselves but for it and here as when the wires were first raised, it might well have

been their duty to notify the plaintiff's servants when they might proceed in safety. We think also that the question of the plaintiff's contributory negligence was, under these circumstances, for the jury.

The judgment of the Appellate Division should be reversed, but as that court has disapproved the finding of the jury a new trial should be ordered, with costs to abide the event.

CHASE, J. (dissenting).  After the plaintiff's truck with its load reached the west side of Bay street there was nothing to prevent its being safely taken along that street under the defendant's cross wires, if it was kept at or near the curb line. There was a greater clearance under the cross wires at the side than in the center of the street. After reaching the west side of the street the truck was driven southerly three or four hundred feet before it was at the height of ground. It was then stopped.

In considering the relative rights and obligations of the parties the conversation between the two foremen before the truck was again started is helpful. As given by the plaintiff's foreman it was as follows:

" Q. And then you had a talk with the foreman? A. Then I had a talk with the foreman. I went outside and stood there while we were hooking up the horses. I merely asked him what did he think about it. ' Oh,' he said, ' he measured it — everything would be all right, if we would keep to the right.'

" Q. And what did you say to that? A. I explained to him. I said, ' Now this is going to turn around either one end or the other and strike that wire just as sure as you live when you are going down that hill.' He said, ' No, it aint. We are here. We will raise the wire up for you.'  *  *  *

" Q. Mr. Hazlegreen, after the foreman told you that

he was there and that he would raise the wires, did you say anything to him? A. Why, I said to him: ' Well, wait a moment; I have to think over that. In regards to what? '

" Q. Well, give me this conversation that you had with him, before you proceeded to go along with your truck. Was anything said at that particular time? A. Nothing, only as everything is all right; go ahead.

" Q. Who said that? A. The foreman of the wrecking crew.

" Q. And then what did you do? A. Well, I had all my drivers standing there along side of me.

" Q. Yes, and what did you do? A. We used a little judgment before we started, and we asked one another, would we think it right for to start. So the wrecking crew people told us to go ahead, ' We are here, and we will protect you. What more do you want? ' "

The second truck was then attached to the truck carrying the pile driver and its wheels were chained so as to make it a drag on the loaded truck and prevent it from descending the slight grade by gravity. Plaintiff's foreman directed his drivers to start the horses and they proceeded with the load. After going a short distance the pile driver came into contact with the live wire and some of the horses were injured. A short time thereafter the horses that were not injured were attached to the truck and it with the pile driver was taken to the place of destination without assistance or further accident. In doing so it was kept along the curb and passed under the cross wires. The front wheels of the truck were four and the rear wheels six feet apart. When the accident occurred and the propelling power was removed from the truck it stopped immediately and its left front wheel was on or very near the defendant's track and its left rear wheel on or about three feet from the track. The turn to the left and the distance traveled had been

sufficient so that the truck instead of being along the curb as it was when the conversation mentioned took place was at or upon the defendant's track. The front part of the truck was at least sixteen feet from the curb. The horses were all in the center of the street along the defendant's car tracks.

There is no claim that either of the parties hereto were unlawfully occupying the public street. Upon the facts disclosed neither had the right to use the street to the exclusion or injury of the other. The use of it by each was subject to reasonable use by the other. It is not necessary or desirable to discuss the rights of the parties in case either had attempted to assert and enforce its alleged rights as against the asserted and alleged rights of the other. Their apparent relation to each other on the day of the accident was one of mutual helpfulness. The purpose of the wrecking crew in accompanying the plaintiff's employees so far as appears was to protect the defendant's property from injury. So far as they were assisting the plaintiff their service was voluntary and gratuitous. There was no express contract between them. There was no implied contract except that reasonable care would be exercised in whatever was actually done or undertaken by either. The defendant's employees had lifted the wires to permit the plaintiff to pass under them when it first came upon Bay street without asserting any claim to be paid therefor and remained to perform gratuitously any service that became necessary for the care of the defendant's property and the convenience of the plaintiff. That there was no necessity for lifting the wires generally along the street is shown by the fact that the plaintiff continued along the curb line without meeting any obstruction for three or four hundred feet on Bay street to the height of ground near where the accident happened. The conversation that we have quoted consisted principally of expressions

of opinion. That the plaintiff's foreman did not wholly rely on the opinion of the defendant's foreman is apparent from the conversation as given by him. He consulted with his drivers and concluded to proceed. The statement of the defendant's foreman amounted to an expression of opinion that the plaintiff could proceed safely if he would keep to the right, and it was accompanied by a statement in substance that he would raise the wires if it at any time became necessary.

The representative of each party was fully aware of the danger of coming into contact with a live wire. It cannot be assumed from the record that the members of the wrecking crew had a superior knowledge in regard to handling the truck with its heavy load to that of the plaintiff's foreman and his associates who had been engaged for years in the trucking business.

It required from ten to fifteen minutes to raise the wires in one place. It could not be done from time to time as the truck was moving. The necessity, if any, for raising the wires had, therefore, to be determined in time to stop the truck and wait until the wires were raised before proceeding further. When the truck started it did not move rapidly. It seems to have been under full control. As it proceeded danger of contact with the live wire must have been apparent, but there does not appear to have been any effort to stop it before the accident to the horses which cut off the propelling power. It is quite evident from the testimony that if the movement of the truck had been closely watched and the plaintiff's drivers had proceeded very slowly around the curve and past the tree, the truck could have been stopped on signal from the foreman the instant danger was imminent. In that case the defendant's workmen were there to lift the wire at the place of immediate danger and permit the truck to continue as it did after the accident along the curb to the place of destination.

I am of the opinion that there is no justification for the assumption by a majority of the court expressed in words as follows: " We think that there is a fair question of fact for the jury as to whether the defendant's servants were not negligent in stating that they could and would lift the wire if danger became imminent and in inviting the plaintiff to drive on when as they now say that was an impossible thing for them to do. Whether there was danger or not was a matter of which they had knowledge and of which the plaintiff's servants had no knowledge."

The judgment of the Appellate Division should be affirmed, with costs.

HISCOCK, Ch. J., CARDOZO and POUND, JJ., concur with ANDREWS, J.; COLLIN and CUDDEBACK, JJ., concur with CHASE, J.

Judgment reversed, etc.